# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )

        )

      Plaintiff,      )

        )

v.        )      Case No. 14-CR-0096-CVE

        )

GREGORY LYNN SHRADER,        )

        )

      Defendant.      )

## OPINION AND ORDER

Before the Court is defendant's motion to suppress (Dkt. # 28) the three firearms and one round of ammunition (the firearms) seized from his home near Jay, Oklahoma pursuant to a search warrant.[1] Defendant is charged with being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1), 924 (a)(2). Dkt. # 2. Defendant argues that the firearms should be suppressed because: the information in the application and affidavit for a search warrant (AASW) was stale; the AASW failed to support probable cause; the search of defendant's home exceeded the scope of the search warrant; and the good faith exception to the Fourth Amendment's warrant requirement does not apply. Dkt. # 28, at 1. Plaintiff responds that the firearms should not be suppressed because the warrant was supported by probable cause and the firearms were lawfully seized under the plain view doctrine. Dkt. # 29. Defendant has filed a reply. Dkt. # 30. A hearing on defendant's motion to suppress was held on May 1, 2015, at which United States Postal Inspector

---

[1]    A search warrant for defendant's DNA was sought and received at the same time as the search warrant for defendant's home. Dkt. # 28-1, at 33. Defendant does not challenge the search warrant for his DNA.

Andrew Rivas, the AASW affiant,[2] and Federal Bureau of Investigation (FBI) Special Agent John Fitzer, who led the search, testified.[3] Dkt. # 31.

## I.

On March 4, 2014, Northern District of Oklahoma Magistrate Judge Paul J. Cleary (the magistrate judge) was presented with the AASW. Dkt. ## 32, 32-1. The AASW, approximately 245 pages long, including attachments and exhibits, detailed Inspector Rivas's investigation into whether defendant committed harassment through the mail, in violation of 18 U.S.C. § 2261A, placed injurious articles in the mail, in violation of 18 U.S.C. § 1716, and mailed a possible hoax device, in violation of 18 U.S.C. § 1038. Dkt. # 32 at 1. The AASW included two attachments, A and B, that specifically and exhaustively described the place to be searched, defendant's home at 45703 County Road 587, Jay, Oklahoma, and the items to be searched for and seized. Id. at 42-48. The AASW sought, inter alia: evidence related to harassing letters and packages, including defendant's computer and printer; evidence related to an improvised explosive device (IED) placed in a postal box, including parts or materials used in the IED's construction; and indicia of ownership of the home. Id. at 5; see also id. at 33-36 (meticulously detailing the evidence sought under the search warrant). Firearms and ammunition were not among the items to be searched for and seized. The AASW also

---

[2]      At the hearing, the parties stipulated that Inspector Rivas's testimony on direct examination would be consistent with the information in the AASW. Thus, the Court will cite to the AASW for that information that would otherwise have been elicited through direct examination of Inspector Rivas.

[3]      Neither party submitted the complete search warrant, AASW, or search warrant return. At the hearing, the Court marked and admitted without objection these three documents as Joint Exhibits A, B, and C, respectively. See Dkt. ## 31-1, 32, 31-2.

included twelve exhibits, including copies of letters, photographs, and several of defendant's pro se court filings. See Dkt. ## 32, 32-1.

A. Summary of the AASW[4]

Defendant was once the business partner of William Bradstreet Stewart; defendant would author and Stewart would publish books on financial trading. Dkt. # 32, at 7. The pair published two such books between 2008 and 2009. Id. While their partnership was ongoing, Stewart once visited defendant's home outside Jay, Oklahoma. Id. Stewart later told officers of that visit, stating that defendant owned a computer and printer, as well as numerous firearms. Id. Stewart also described conversations in which defendant told Stewart of plans to hide firearms in and around the home. Id. at 7-8. Stewart and defendant ended their partnership when Stewart declined to publish one of defendant's books; Stewart believed that the material defendant submitted as his own had already been published in another author's book. Id. at 8. Stewart thereafter informed a number of his clients of the end of the business relationship, an event that became public. Id. Defendant subsequently filed a defamation lawsuit in the District of Colorado against Stewart and several other individuals.[5] Id.

---

[4]    Although summarized herein, the AASW is a voluminous document, including two attachments (A and B) and twelve exhibits (1-12). No summary can do it justice. A determination of probable cause requires review of the entire document, which the undersigned has done.

[5]    The defamation lawsuit was later dismissed for lack of personal jurisdiction and failure to state a claim. Dkt. # 28-1, at 13. Defendant appealed, and the Tenth Circuit Court of Appeals affirmed the district court's dismissal. Id. Defendant's petition for writ of certiorari to the Supreme Court of the United States was not granted. Id. Prior to his lawsuit in the District of Colorado, defendant filed a separate suit against Stewart in the Eastern District of Oklahoma; that suit was also dismissed for lack of personal jurisdiction. Id. On November 6, 2013, defendant filed a new action against Stewart and others in Missouri state court, which was subsequently removed to the Western District of Missouri. Id. at 19. Like the other suits, defendant's suit in Missouri was dismissed for lack of personal jurisdiction. See Shrader v. Biddinger et al., No. 6:14-cv-03002-BCW, Dkt. ## 30, 39 (W.D. Mo. 2014).

One of the individuals sued in that case received a package containing "documents pertaining to a million dollar judgment and Oprah Winfrey"; when confronted by the recipient, defendant reportedly admitted that he sent the package. Id. at 16.

Stewart began to receive or be the subject of various harassing letters and parcels not long after the civil proceedings began. In February 2011, Stewart received a letter that was addressed to "Allied Riverside NAR Enforcement," a law enforcement agency in California, but that identified him as the sender. Id. at 10. The letter, purportedly from an "undercover agent," alleged that Stewart was a heroin trafficker. Id. At approximately the same time, Stewart received, from a fictitious sender, a package containing flatulence powder. Id. at 11. In the fall of 2011, the San Diego field office of the FBI received an anonymous letter accusing Stewart of being involved in terrorist activities. Id. at 9. The letter led FBI agents to investigate Stewart, but they later concluded that the allegations were false. Id. In January 2012, Stewart received a letter, purportedly from himself and addressed to one Michael Wong, in which the letter's author attempts to extort Wong and makes a death threat against defendant. Id. at 10. Defendant, also claiming to be a recipient of that letter, submitted it in his defamation lawsuit in the District of Colorado. Id. In the winter of 2012, the Louisiana State Penitentiary received a package, purportedly from Stewart and addressed to a death row inmate, that contained a syringe, a ten-dollar bill, and 1.6 grams of heroin. Id. at 11.

The 2011 letters and the January 2012 letter each had a Tulsa, Oklahoma postmark. Id. at 9-11. When this fact was presented to the district court in defendant's Colorado federal defamation case, "Stewart continued to receive harassing mailings but they were no longer postmarked from Oklahoma." Id. at 12. Inspector Rivas and an FBI special agent compared the letters and packages to several of defendant's pro se filings in his defamation suit. Id. at 13. They found numerous

similarities, including common capitalization, spelling, and punctuation errors, as well as common word choice and formatting. Id. at 14-15. A forensic examiner compared the February 2011 letter to samples from defendant and "concluded that it was probable that" defendant authored the letter. Id. at 15.

At approximately 11:30 a.m. on April 11, 2013, a postal employee removed a package addressed to Joe Arpaio, the Sheriff of Maricopa County, Arizona, from a rural postal box in Arizona.[6] Id. at 19. Stewart's address was the return address on the package. Id. Inspector Rivas took custody of the package, and he found a "silver grain-like material" spilling from its seams. Id. at 20. The material was determined to be a smokeless explosive powder, and an explosive ordinance disposal technician from a nearby police department thereafter disabled the device. Id. The package contained a number of components in addition to the powder--including batteries, wiring, and a solar igniter--that led investigators to classify the package as an IED, although they could not determine if the IED had been operational. Id. at 20-21. The package was later sent the U.S. Postal Inspection Service Crime Laboratory and then the Alcohol, Tobacco, and Firearms Criminal Laboratory for further analysis. Id. at 21. DNA evidence found in the package was compared to Stewart's DNA, and it was found not to be a match. Id.

Inspector Rivas, after investigating Stewart, began to examine whether defendant could be responsible for the IED. While surveilling the area near defendant's home, postal inspectors observed a man matching defendant's description driving a Nissan Rogue with Arkansas license plate 684 MOA. Id. at 25. The vehicle was registered to Rachelle Raimer, who lived nearby. Id. In

---

[6]     Inspector Rivas testified that postal employees would check that postal box once per day, around noon; thus, according to his testimony, the package was deposited at some point between noon on April 10 and 11:30 a.m. on April 11.

July 2013, investigators gained access to defendant's credit card records and found charges from February 2013 at an arts and crafts store, where components of the IED could have been purchased. Id. at 25-26. However, investigators could not determine from the records what items defendant actually bought. Id. at 26. In August 2013, investigators gained access to bank records showing that defendant made a purchase at a gas station in Amarillo, Texas on April 10, the day before the IED was found. Id. Surveillance video from the gas station showed defendant purchasing fuel for Raimer's vehicle on that date. Id. at 26-27. Investigators later found additional April 10 surveillance video of the vehicle, identifiable by its license plate, at the south entrance of Grand Canyon National Park, located approximately sixty-five miles from where the IED was recovered. Id. at 27. A traffic camera approximately one mile from the postal box provided video footage, from which still photographs were extracted, showing that on April 10[7] a vehicle similar to Raimer's passed in front of it, but the license plate was not visible. Id. at 27-28. On January 2, 2014, Inspector Rivas confirmed that defendant maintained an active post office box in Missouri. Id. at 24.

---

[7] At the hearing, there was much ado about the date stamp on these photographs, which is April 10, 2013. Dkt. # 28-5, at 2-4. The AASW, after describing what the photographs depict, states: "In addition, there appears to be only one silver Nissan Rogue that is captured on the video on that April 11." Dkt. # 32, at 28. A criminal complaint in a separate criminal action against defendant in the District of Arizona and arising from the same facts as this case alleges that the pictures were from April 11, 2013. Dkt. # 28-2, at 9. However, at the hearing on defendant's motion to suppress, Inspector Rivas testified that the dates on the photographs were correct and that the AASW's recitation of April 11 was a mistake. He further testified that this issue was raised and corrected in defendant's case in the District of Arizona. Plaintiff's counsel referenced a copy of the Arizona indictment, filed March 11, 2014, and the superseding indictment, filed April 9, 2014, both of which charged defendant with placing an IED in a postal box on or about April 10, 2013. Defendant was thereafter tried by a jury and convicted. Dkt. # 29, at 2. The Court finds that the photographs record images from April 10, 2013. The Court further finds that the references to April 11 in the AASW and the criminal complaint in defendant's Arizona case were inadvertent error.

B. The Search Warrant

The magistrate judge signed a search warrant for defendant's home on March 4, 2014. Dkt. # 31-1, at 1. The warrant identified the property to be searched as defendant's home, and it provided an address, a photograph, and a physical description of the property. Id. The warrant included no further restrictions on the place to be searched. Id. The warrant states that the items to be searched for and seized are listed in an attachment to the warrant, and the attachment is a copy of Attachment B from the AASW. Compare id. at 3-9; with Dkt. # 32, at 43-48.

C. The Search and Seizure

According to Special Agent Fitzer, who was the team leader in charge of the search of defendant's home, the search took place on March 6, 2013 from approximately 10:00 a.m. to 5:00 p.m. Before the search began, Special Agent Fitzer and the search team were informed that defendant had prior felony criminal convictions. Special Agent Fitzer assigned members of the search team to different duties; those individuals assigned to search for evidence were to contact him and the case agent when possible evidence was found. Special Agent Fitzer and the case agent would determine if the item should be seized pursuant to the warrant. During the search of defendant's home, while items related to the construction of the IED were as yet not found, three officers entered an upstairs bedroom that contained what appeared to be a built-in bookcase. The officers believed the bookcase to be easily removable, and Special Agent Fitzer authorized its removal. The bookcase was moved away from the wall, revealing attic space filled with insulation. While Special Agent Fitzer was in another area, one of the searching officers reached into the insulation behind where the bookcase had been located and felt what the officer believed to be the stock of a firearm. Special Agent Fitzer was called; he repeated the searching officer's actions and felt what he too believed to

be a firearm.[8] When the officers moved some of the insulation aside, they discovered three firearms and one round of ammunition inside large black trash bags.

## II.

The purpose of a suppression hearing is "to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). "The proponent of a motion to suppress has 'the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search.'" United States v. Gama-Bastidas, 142 F.3d 1233, 1238 (10th Cir. 1998).

At the suppression hearing, plaintiff presented two witnesses, Inspector Rivas and Special Agent Fitzer. Dkt. # 31. The Court finds the testimony of Inspector Rivas and Special Agent Fitzer to be credible. Defendant presented no witnesses at the hearing, but he offered five exhibits, which were admitted without objection. Id.

## III.

A. Stale Information in the AASW

Defendant argues that the information in the AASW was stale and, for that reason, did not provide probable cause to search his home. Dkt. # 28, at 8. The Fourth Amendment, protecting the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," requires that "no Warrant shall issue, but upon probable cause, supported

---

[8] Defendant repeatedly states that the firearms were found under "36 inches of attic insulation." Dkt. # 28, at 3; Dkt. # 30, at 3. When asked, Special Agent Fitzer could not recall the exact depth of the insulation. However, Special Agent Fitzer testified that he was able to reach into the insulation and feel the firearm, as was another agent. The Court finds this testimony to be credible.

by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The Tenth Circuit has defined probable cause as "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). Probable cause "cannot be based on stale information that no longer suggests that the items sought will be found in the place to be searched." United States v. Snow, 919 F.2d 1458, 1459 (10th Cir. 1990). Whether information is stale depends not only on the time elapsed between the criminal activity and the issuance of the warrant but also on "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." United States v. Shomo, 786 F.2d 981, 984 (10th Cir. 1986). Probable cause may be found, even when there is a substantial delay between the criminal activity and the warrant application, where "the property sought is likely to remain in one place for a long time" or where "the affidavit recites facts indicating ongoing, continuous criminal activity." United States v. Garcia, 707 F.3d 1190, 1195 (10th Cir. 2013) (quoting Shomo, 786 F.2d at 984).

Defendant asserts that the information in the AASW was stale when officers applied for a warrant on March 4, 2014, as too much time elapsed between the criminal activity and the application. Dkt. # 28, at 8. He focuses on the mailing of the IED as the "criminal activity" at issue and emphasizes that it was a one-time event that took place eleven months before the application. Id. He also notes that AASW was presented eight months after the officers received the photographic evidence and fifteen months after the final letter described in the AASW was sent. Id. at 9. Additionally, defendant argues that the property to be seized was easily disposable, requiring the officers to act quickly to prevent their information from becoming stale. Id.

Defendant's focus on the mailing of the IED is too narrow, as that act does not encompass the entirety of the alleged criminal activity. The AASW states that defendant was suspected of, inter alia, ongoing harassment through the mail, in violation of 18 U.S.C. § 2261A(2). Dkt. # 32, at 2-3. Thus, the relevant criminal activity is not simply the mailing of the IED; it is the entire chain of letters and packages sent with the intent to harass Stewart. The first letter and package were sent in February 2011, with additional letters or packages sent in the fall of 2011, January 2012, and the winter of 2012. Id. at 9-11. Finally, the IED was found in April 2013. Id. at 19. Thus, the criminal activity that defendant was suspected of committing was an "ongoing, continuous criminal activity" that lasted for more than two years. Garcia, 707 F.3d at 1195. For that reason, the period of time between a particular criminal activity, the mailing of the IED, and the application for a search warrant is less relevant to the question of staleness. See id.

Additionally, defendant's argument as to the length of time between the last criminal activity and the application does not account for the time investigators spent gathering evidence and preparing the AASW. In Snow, the Tenth Circuit found that information in an affidavit was not stale where the information uncovered by the investigation "was cumulative in nature, requiring the F.B.I. to delay going before the magistrate until sufficient evidence was obtained." Snow, 919 F.2d at 1460. In the approximately eleven months between the date the IED was discovered and when the search warrant issued, officers developed the basis for the warrant. On April 29, 2013, the U.S. Postal Inspection Service Crime Laboratory provided Inspector Rivas with a report of the items used to create the IED. Dkt. # 32, at 22. The package was then sent for further analysis at the Alcohol, Tobacco, and Firearms Criminal Laboratory. Id. at 23. In July 2013, the officers obtained defendant's credit card records; in August, Inspector Rivas obtained defendant's bank records. Id.

at 25-26. Using those records, the investigators found the surveillance videos showing defendant passing through Amarillo, Texas on his way to Grand Canyon National Park. Id. at 26-27. The investigation continued until at least January 2, 2014, when Inspector Rivas confirmed that defendant maintained an active post office box in Seneca, Missouri. Id. at 24. At most, investigators waited only two months to present their application, and at least some of that time must have been spent preparing the AASW, which was 245 pages long, including two attachments and twelve exhibits. See Dkt. # 32. Like in Snow, the investigation here was cumulative, and the Court finds no fault in the decision to wait until sufficient evidence had been obtained before seeking a warrant. See Snow, 919 F.2d at 1460.

Defendant's characterization of the evidence sought as easily disposable is somewhat misleading. Much of the evidence sought was in the form of documents, including electronically stored information, which investigators hoped would show that defendant was the source of the harassing letters and packages. See Dkt. # 32, at 43-45. Documents can be easily disposed of, as defendant argues. However, investigators believed that these documents would be stored as files on defendant's computer, and they had no reason to believe that defendant would render those files unretrievable. See United States v. Tisdale, 553 F. App'x 836, 838 (10th Cir. 2014)[9] ("Information in a search-warrant affidavit is not stale if it suggests the items sought are currently located in the place officers seek to search." (citing United States v. Harris, 735 F.3d 1187, 1192 (10th Cir. 2013)); see also Dkt. # 32, at 36 (noting that "data that exists on a computer is particularly resilient to deletion"). Moreover, many of the items related to the construction of the IED were items of general

---

[9]    Unpublished decisions are not precedential, but they may be cited for their persuasive value. See FED. R. APP. 32.1; 10TH CIR. R. 32.1.

utility, such as wires. Inspector Rivas testified that, in his experience, such items do not degrade, and thus could likely be found in defendant's home even though many months had passed since the IED was placed in the postal box.

As defendant was allegedly engaged in an ongoing criminal activity, investigators continued to develop evidence prior to seeking a warrant, and at least some of the evidence sought was not the type that would be readily disposed of, the facts in the AASW were not so stale that they could not serve as the basis for probable cause. See Snow, 919 F.2d at 1460 (upholding a magistrate judge's finding of probable cause where defendant was being investigated for a continuous criminal activity and where investigators delayed seeking a warrant in order to gather more evidence).

### B. Probable Cause in the AASW

Defendant argues that the AASW included insufficient facts to support probable cause to search his home. As noted above, probable cause is "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). "An affidavit in support of a search warrant must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). In determining whether probable cause exists based on an affidavit, the magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 214 (1983). "Reviewing courts should give the magistrate's ultimate probable cause decision 'great deference,'"

unless the affidavit "does not provide 'a substantial basis for concluding that probable cause existed.'" United States v. Rowland, 145 F.3d 1194, 1204 (10th Cir. 1998) (quoting United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996) (en banc)).

Defendant divides the allegations in the AASW into three broad categories--the allegedly harassing mail, the trip to Arizona, and the construction of the IED--and argues that for each category there is insufficient evidence to support probable cause. Dkt. # 28, at 4-6. He contends that, at the time the AASW was prepared, there was no affirmative link between himself and the harassing letters and packages sent to Stewart and others. Id. at 5. Thus, he argues, basing probable cause on the mailings would require "piling hunch upon hunch," which the Tenth Circuit has forbidden. United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir. 2004). He also asserts that the vehicle in the photographs taken near the postal box could not be the vehicle he was driving in Arizona: he alleges that the vehicle he was driving was equipped with mud flaps, and the vehicle in the photographs was not. Compare Dkt. # 28-3, at 2, with Dkt. # 28-5, at 2-4. Finally, he argues that, prior to the search, there was no definitive evidence showing that he was responsible for creating the IED. Dkt. # 28, at 6.

Even disregarding the photographs taken near the postal box where the IED was found,[10] the remaining allegations in the AASW provide a sufficient basis for finding probable cause to search

---

[10]    While the photographs taken near the postal box do not clearly show that the vehicle was equipped with mud flaps, they also do not clearly show that the vehicle was not equipped with mud flaps. See Dkt. # 28-5, at 2-4. Inspector Rivas testified that the vehicle was moving quickly when the image was captured and, as a result of the speed of the vehicle and the angle of the camera, mud flaps would not have been visible. It is unclear whether the vehicle in the photographs is in fact defendant's vehicle, a point made in the AASW itself. See Dkt. # 32, at 28. However, the Court need not consider these photographs to resolve defendant's motion, as the remaining facts in the AASW are sufficient to support the magistrate judge's probable cause determination.

defendant's home. The AASW notes that many of the letters were postmarked from Tulsa, Oklahoma, which "is the nearest post office processing center to [defendant's] residence." Dkt. # 32, at 12. When Stewart's attorneys emphasized this fact in one of defendant's lawsuits, "Stewart continued to receive harassing mailings but they were no longer postmarked from Oklahoma." Id. The AASW also highlights the similarities between known documents from defendant, primarily court filings and e-mails, and the harassing letters. Id. at 13-16. These similarities included common capitalization, punctuation, and spelling errors, as well as word choice and formatting decisions within the letters.[11] Id. at 14-15. A forensic examiner concluded, based on his review of known samples from defendant, that "it was probable" that defendant authored the letter alleging that Stewart was a heroin trafficker. Id. at 15. A party in one of defendant's lawsuits allegedly spoke to defendant after receiving a suspicious package similar to those sent to Stewart, and defendant reportedly took responsibility for mailing that package.[12] Id. at 16. The AASW alleges that the letters and packages were created by computer and then printed, and it states that, prior to the acrimony between them, Stewart visited defendant's home and observed a computer and printer. Id. at 7, 13. Thus, the AASW clearly connects the harassing letters to defendant and to his home.

---

[11]    In his reply, defendant argues that these similarities are either not present or common to many computer-generated documents. Dkt. # 30, at 2-3. However, while certain mistakes may be common--writing "law suit" instead of "lawsuit," for example--others, such as writing "sells" instead of "sales" or "are" instead of "our," would not be. See Dkt. # 32, at 14-15. Moreover, defendant does not address, much less undermine, Inspector Rivas's testimony regarding the forensic examiner's conclusion that defendant was the likely author of at least one of the harassing letters. See id. at 15.

[12]    Hearsay, even several layers of hearsay, may be used to supply the basis for probable cause as part of a warrant application. United States v. Mathis, 357 F.3d 1200, 1204 (10th Cir. 2004) (citations omitted); see also Gates, 462 U.S. at 238-39.

Furthermore, the evidence in the AASW links defendant to the IED, albeit not as strongly. Postal inspectors observed defendant driving a Nissan Rogue, registered to Raimer, near defendant's home. Id. at 25. Surveillance video showed defendant purchasing gasoline for that vehicle in Amarillo, Texas on the morning of April 10, 2013. Id. at 27. The video is corroborated by defendant's bank records. Id. at 26. The vehicle, identified by its license plate number, can be seen entering the south entrance of Grand Canyon National Park in the afternoon of April 10, 2013. Id. at 27. That entrance is approximately sixty-five miles from the postal box where the IED was mailed. Id. Thus, even without considering the photographs to which defendant objects, the facts in the AASW show that defendant was geographically near the postal box--and more than one thousand miles from his home northeastern Oklahoma--at a time when the IED was placed in the postal box.[13] Finally, the AASW notes that, two months before the IED was mailed, defendant made purchases at an arts and crafts store, and it states that the store stocked some of the components used to construct the IED. Id. at 26. However, the AASW also states that officers could not confirm that the purchased items included those used to create the IED. Id.

Bearing in mind that this Court must give the magistrate judge's determination of probable cause "great deference" unless the AASW does not provide "a substantial basis" for such, Rowland, 145 F.3d at 1204, suppression is not required here. There are ample connections between defendant and the harassing letters and packages, placing defendant at the center of a multi-state, multi-agency

---

[13]  This finding would be even stronger were the Court to consider the photographs taken near the postal box. Prior to the exhaustive discussion of the issue at the hearing, the AASW stated that the photographs showed images from the afternoon of April 11, 2013. Such photographs would have had little value, as by that point the package would already have been found by the postal worker. However, as determined at the hearing, the images show the afternoon of April 10, within the time period when the IED was placed in the postal box.

investigation into ongoing harassment through the mail. Moreover, there was reason to believe that defendant, if he was the source, created the letters and packages in his home. Additionally, there was some evidence, albeit limited, linking defendant to the construction and mailing of the IED. The Court finds that the AASW undoubtedly presented enough facts to support probable cause that evidence of a crime or crimes would be found in defendant's home. Thus, the Court finds no error in the magistrate judge's probable cause determination, and finds that the search warrant was legally issued.

C. The Scope of the Search

Defendant argues that the officers exceeded the scope of the search warrant because the warrant did not mention firearms, and that the plain view doctrine does not apply. Dkt. # 28, at 6-8. The Fourth Amendment prohibits general searches, requiring search warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The Supreme Court has noted that the particularity requirement exists to prevent "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). "The scope of a search is generally defined by its expressed object." Florida v. Jimeno, 500 U.S. 248, 251 (1991). "When law enforcement officers grossly exceed the scope of a search warrant, suppression of all evidence seized under that warrant is required." Snow, 919 F.2d at 1461.

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Coolidge, 403 U.S. at 465. However, because "in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure," id., the plain view doctrine applies only if:

> (1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there

was probable cause to believe it was contraband or evidence of a crime), and (3) the officer had a lawful right of access to the object.

United States v. Thomas, 372 F.3d 1173, 1178 (10th Cir. 2004) (citing United States v. Sparks, 291 F.3d 683, 690 (10th Cir. 2002)).

All three requirements of the plain view doctrine are met here. As to the first requirement, the firearms were found as part of officers' search of defendant's home pursuant to a valid search warrant. Defendant argues that the search warrant, which allowed officers to find and seize evidence related to the letters and the IED, did not authorize a search for or seizure of firearms. Dkt. # 28, at 6. However, the Supreme Court has stated that

> [a] lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. . . . When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, . . . must give way to the interest in the prompt and efficient completion of the task at hand.

United States v. Ross, 456 U.S. 798, 820-21 (1982). For example, federal agents were found to have exceeded the scope of a search warrant when agents searched the defendant's entire home and seized objects from within, even though the warrant explicitly limited the search to the defendant's vehicle and safe. United States v. Angelos, 433 F.3d 738, 745-46 (10th Cir. 2006). However, an officer's search of a box in a closet--and subsequent seizure of the sawed-off shotgun inside the box--was within the scope of a search warrant where the warrant allowed officers to search the entire home, including the closet, and to seize objects that could have been found in the box. United States v. Naugle, 997 F.2d 819, 822 (10th Cir. 1993).

Here, the firearms were discovered underneath insulation in defendant's attic, the opening to which was located behind a removable bookshelf. According to Special Agent Fitzer's testimony,

at the time that he authorized removal of the bookshelf and the search of the attic space, some physical evidence related to the construction of the IED had not yet been found. The attic space was within the scope of the search warrant, as it was located inside defendant's home and the warrant authorized a search of defendant's home, without limitation. See Naugle, 997 F.2d at 822. Virtually all of the items named in the warrant could have been hidden in the attic space--an area large enough to contain the firearms is certainly large enough to contain a document or an IED component. Thus, Special Agent Fitzer was "lawfully in a position from which the object seized was in plain view." Thomas, 372 F.3d at 1178.

The second requirement of the plain view doctrine is that "the object's incriminating character" must be "immediately apparent." Id. While possession of a firearm by an ordinary citizen is not a crime, possession of a firearm by a convicted felon is. 18 U.S.C. § 922(g)(1). Thus, whether the firearms' unlawful character would have been immediately apparent depends on whether it was known that defendant had previous felony convictions.[14] Special Agent Fitzer testified that he was made aware of defendant's prior felony convictions before the search began. When one of the searching officers felt what was believed to be a firearm in the attic space, Special Agent Fitzer was called in to verify what had been found. Special Agent Fitzer also felt what he believed to be a firearm, and he authorized the retrieval of the item that he had felt. Thus, the "incriminating character" of the firearms would have been "immediately apparent," as Special Agent Fitzer knew that it was unlawful for defendant to possess the firearms. Thomas, 372 F.3d at 1178.

---

[14] Although neither party describes these crimes in its response, the indictment states that defendant was previously convicted in Arkansas state court of two counts of theft by receiving in 1983, attempt to manufacture a controlled substance in 1984, and terroristic threatening in 1985. Dkt. # 2.

The third requirement of the plain view doctrine is that the seizing officer must have "a lawful right of access to the object." Id. As discussed above, the search warrant tasked officers with searching for and seizing, inter alia, documents and IED components from defendant's home. There was no limitation in the search warrant preventing officers from looking in the attic space--or anywhere else in the house--for the objects of their search. See Angelos, 433 F.3d at 745. Thus, Special Agent Fitzer could lawfully access the firearms.

The three requirements of the plain view doctrine are met here. The first and third, that the officer lawfully observe and lawfully access the object to be seized, are present because the search was conducted pursuant to a valid warrant that contained no search restrictions. The second requirement, that the "incriminating character" of the object be "immediately apparent," is met because Special Agent Fitzer was aware of defendant's prior felony convictions. Thus, the seizure of the firearms fell within the plain view doctrine and did not violate the Fourth Amendment.

D. Good Faith Exception

Finally, defendant argues that the good faith exception enunciated in United States v. Leon, 468 U.S. 897 (1984), does not apply. In Leon, the Supreme Court held that, when police officers act in good faith and in reasonable reliance on a search warrant, the evidence obtained during the search should not be suppressed even if the warrant was lacking in probable cause. See Leon, 468 U.S. at 913; United States v. McKneely, 6 F.3d 1447, 1453-54 (10th Cir. 1993). There is a presumption that, when an officer relies on a warrant, the officer is acting in good faith. McKneely, 6 F.3d at 1454. This presumption is "not absolute," but it "must carry some weight." Id. (quoting United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985).

However, the good faith exception does not apply in four situations:

> [F]irst, when 'the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for 'his reckless disregard of the truth'; second, when the 'issuing magistrate wholly abandon[s his] judicial role'; third, 'when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and fourth, 'when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.'

United States v. Burgess, 357 F. App'x 974, 975 (10th Cir. 2009) (citing United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)). Further, the Tenth Circuit has held that the good faith exception "will not save an improperly executed warrant." United States v. Rowland, 145 F.3d 1194, 1208 n.10 (10th Cir. 1998) (citing United States v. Moland, 996 F.2d 259, 261 (10th Cir. 1993)). Defendant argues that the Leon good faith exception does not apply here for three reasons: first, Inspector Rivas "attempted to mislead the magistrate" by including the photographs from the surveillance camera located near the postal box; second, the warrant was lacking in indicia of probable cause because "officers knew that there was no evidence directly linking Shrader to the IED"; and third, the officers improperly executed the search warrant by exceeding its scope. Dkt. # 28, at 10-11.

As to the first argument, defendant contends that Raimer's vehicle was equipped with mud flaps and the vehicle in the photographs was not and, as a result, the inclusion of the photographs was a blatant attempt to mislead the magistrate judge. Dkt. # 28, at 11. However, the AASW clearly states that the photographs do not show the license plate of the vehicle in the photographs, making it impossible to positively identify the vehicle as the one driven by defendant to Arizona. Dkt. # 32, at 28. Rather, the AASW states that Inspector Rivas "believes that the vehicle closely resembles" the vehicle that defendant was observed driving near his home outside Jay, Oklahoma and was seen on video refueling in Amarillo, Texas. Id. At the hearing, Inspector Rivas testified that the

photographs taken from the camera near the postal box are still images showing the vehicle while it was in motion. Based on the angle of the photographs and the speed of the vehicle, Inspector Rivas did not believe that any equipped mud flaps would be visible. Regardless of whether the vehicle in the photographs was in fact equipped with mud flaps, Inspector Rivas has offered legitimate justification for his belief that the vehicle in the photograph "closely resembles" the vehicle that defendant was driving in Arizona, and the AASW states that the vehicle could not be positively identified. Furthermore, Inspector Rivas testified repeatedly that he had no intent to mislead the magistrate judge by including the photographs. The Court, which has already found Inspector Rivas's testimony credible, further finds that the inclusion of the photographs was not intended to mislead the magistrate judge, nor was any mistake as to the date intended to mislead the magistrate judge.

Defendant also argues that the good faith exception does not apply because the warrant was lacking in indicia of probable cause, as there was no direct connection between defendant and the IED. Dkt. # 28, at 11. However, defendant's focus on the IED is once again too narrow. Even if the officers "knew that there was no evidence directly linking [defendant] to the IED," id., as defendant claims, there was certainly evidence connecting defendant to the other harassing letters and packages. Given that the AASW specifically recited a potential violation of 18 U.S.C. § 2261A(2), which prohibits the use of the mail to harass or intimidate another, see Dkt. # 32, at 2-3, any lack of "direct link[]" between defendant and the IED would not have rendered the good faith exception inapplicable. However, in addition to the evidence related to the other letters and packages, there was some evidence tying defendant to the IED, including his presence in Arizona when the IED was

mailed and his purchases at an arts and crafts store. The warrant was not so lacking in indicia of probable cause as to render the good faith exception inapplicable.

Defendant's third argument, that the good faith exception cannot apply where officers exceed the scope of a warrant, see Rowland, 145 F.3d at 1208 n.10, is foreclosed because, as discussed above, the seizure of the firearms comes within the plain view doctrine. Thus, the officers did not exceed the scope of the warrant when seizing the firearms, and the good faith exception may still apply. As defendant has failed to identify any basis that it should not apply, the Court finds that the good faith exception to the warrant requirement established in Leon would apply here. See Burgess, 357 F. App'x at 975.

**IT IS THEREFORE ORDERED** that defendant's motion to suppress evidence (Dkt. # 28) is hereby **denied**.

**DATED** this 6th day of May, 2015.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE